Thank you. Good morning, Your Honors. I'm going to attempt to reserve four minutes for rebuttal. This is a Social Security claim. Basically what happened is Mr. Grube, a former police officer, had some occlusions in the artery by the abdominal area. He needed a surgery. He underwent the surgery, started to recover, re-occluded, went back into the hospital, coded, had a nine-day coma. And when he came out, he developed some complications, including loss of memory and concentration, as well as significant pain running from the abdominal area into the scrotum area. As I understood the record, he did return to work as a police officer after those horrible medical experiences, did he not? Correct. And then eventually he medically retired. Correct. And so when he was returned to work, he was moved into a desk-accommodated position. That's how it's --. Light duty, right? Right. So we don't know exactly what that entailed. What's also --. It did entail him working. Yes. And we also don't know how long that work actually lasted. The transcript's actually very confusing on this. Mr. Grube testified that --. We know when they granted him a medical disability retirement, do we not? Yes, he did. So that date is in the record. Correct. And doesn't that correlate to basically the date of the onset? It is the onset date of disability. Okay. Okay. Right. But the point I was making is when he returned to work, it was light duty, it was accommodated duty, supposed to have lasted a year, but if you look, he wasn't released to his light duty position until June of 05. I think the case for me turns on whether or in determining that even though he could no longer return to his prior employment as a patrol officer at step four, at step five were there other jobs in the national economy that he was nonetheless capable of performing. Okay. So in addressing the step five, clearly the administrative law judge didn't adequately address the vocational consultant testimony as well as a lot of the medical reports that we have in the file. For example, there's a consultative examination by Dr. Pitum, which is one of the defendant's own physicians, who assessed the number of restrictions and limitations, and the vocational expert said based upon those specific restrictions and limitations, Mr. Grube would not be able to sustain any work at step five. But was the ALJ compelled to accept those restrictions and limitations? He indicated in his decision that he was accepting the restrictions and limitations set forth by the psychological consultative examiner. There's no actual, I'm giving it great weight, but there's, this is what he wrote, I don't see any problems with it, it's that kind of language that tells us that he actually accepted those specific restrictions and limitations. So is your argument that by accepting those, and which provider did you say those were? That's Dr. Pitum. P-E-T-U-M? P-E-E-T-O-O-M, and that appears at TR 346 to 353. Okay, so my question is, is it your position that having accepted those limitations, that the ALJ was compelled at that point to find that there was no work that the petitioner could perform? Yes. The only exception I would give you is if the ALJ actually went out of its way and set forth clear and convincing reasons explaining why particular psychological restrictions and limitations were rejected. And he never did that. So there's no reason for a reviewing court to conclude that he discounted any of that physician's opinion. What portion of the ALJ decision addressed Dr. Pitum's recommendations? Say that again? What portion of the ALJ decision addressed Dr. Pitum's recommendations? I can give you the ‑‑ I don't want you to do it. You don't want the page number? Right at the top of your head. You can do it when you come back. Okay. Great. And I would also note that he was evaluated by another physician psychologically under contract with the Social Security Administration, Dr. Pawar. And he indicated that Mr. Grube would have poor concentration and that Mr. Grube's memory was not intact. And that was at TR 760 to 763. So that would bolster the restrictions and limitations set forth by Dr. Pitum. The concentration is impaired does not necessarily equate to a finding of disability. Well, that's accurate. It depends upon the degree of limitation. And we have a ‑‑ Social Security has a policy ruling on that, SSR 85-15, which is cited in the brief, which indicates that in order to even do unskilled work, there's a level of memory and concentration as well as a level of ability to deal with coworkers and supervisors that's germane to every job, including these unskilled jobs. How do you get around the ‑‑ ALJ placed great weight on his daily activities, which looked fairly extensive to me. I mean, he's repairing cars, he's driving ‑‑ taking care of the kids, driving them back and forth to school. Yes, Your Honor. He seems to have a pretty active lifestyle. That has to do with how he describes the know how much they're driving, how long they're driving, why aren't they driving long distance. In Mr. Groove's case, it shows that his driving is short distances only. It's at his will. Same thing with the yard. He testified he has a very small yard. No one asked him how small it actually is. The record shows that when he tries to mow his yard, he experiences shortness of breath. He testified that he has difficulty standing or walking for prolonged periods of time. So if he's mowing a portion of a small yard, he has some difficulty, he goes in, he rests, he comes out, there's nothing inconsistent with any of that. And that's what the record indicates in all of his reports in terms of daily activities or to social security physicians that are doing these examinations. I'm looking at ‑‑ I don't quite get that out of the ALJ's recitation, which I assume we have to assume are findings of fact. I'm looking at ER 35A, I think it's also page 8 of the ALJ's opinion, the paragraph at the top of the page, the undersigned, meaning the ALJ, finds that the claimant's impairments result in mild limitations in his activities of daily living. And then he goes on to talk about all the things we were just discussing with regard to doing light housework, picking children up from school, going to the doctor, doing stretching exercises. He swims and goes to the grocery store. That's what ‑‑ that's how the administrative law judge characterized it. But if we look at cases like ‑‑ Those are ‑‑ that's more than a characterization, those are factual findings. Right. The undersigned finds. So the question is whether or not there is substantial evidence in the record to bolster the ALJ's findings or whether we have to declare that they're clearly erroneous or not supported by substantial evidence. Isn't that what we do on review? Well, we have to look at the nature and extent of the activities, which I don't think that the administrative law judge did. I think it was under the paragraph talking about them. Right. And if you take a look, Your Honor, the administrative law judge is citing Exhibit 5E to support this particular proposition that he's setting forth, as well as the report of the Social Security's physician. If you look at Exhibit 5E, specifically at page 143, it says what were you able to do before your illnesses or conditions and what can't you do now. He says he cannot sit, stand, lift for any sustained period of time. He has a lack of concentration, poor memory, extreme fatigue, must move every hour, has some insomnia some days, extreme fatigue. Sometimes he forgets to bathe. He needs reminders. He needs to be, and I'm reading from TR 143, which is Exhibit 5E. What do we do? I'm still kind of hung up on this paragraph because it does seem to address his cognitive testing was low average and medicine helped his concentration. His immediate memory was good and he had mild limitations in understanding simple instructions and his judgment and insight were intact. There were no instances of decompensation and the claimant did not demonstrate any difficulty in attending to proceedings or answering questions at the hearing. I mean, this is the finder of fact who's looking at the witness while he's testifying. But the administrative law judge is citing in support of that the reports of Social Security's physicians who set forth, they come to opposite conclusions. They set forth all these restrictions and limitations. The IQ testing shows that this former police officer's IQ dropped to somewhere around 80 to 85 points. He's performing well below his pre-morbid abilities. But that doesn't make him disabled, though. I mean, it's unfortunate that his IQ dropped, but it wasn't in the range where he's considered to be incapable of functioning at a mental level. Right? It's low average. Well, so the question becomes if he has a decline and the administrative law judge finds that it's mild to moderate, we have to see what evidence the administrative law judge is basing that upon. The administrative law judge is citing to the reports of the consultative examiners who indicate that there are more significant limitations. The administrative law judge does not explain why he Well, you cited the psychologist, Dr. Petum, and he didn't say that there were any mental deficiencies that would preclude him from working. The physician doesn't render an opinion do The psychologist. Yes. He doesn't render an opinion he's precluded from working or not precluded from working. He renders an opinion of restrictions and limitations. He said, and I'm looking at page 353 of the record, when he's summarizing his observations, he said that data from the current evaluation revealed some limitations in concentration, not severe, and overall intellectual functioning, the latter falling into the low average range. And the AOJ then picks up on that on the full paragraph on page 8 of his hearing where he summarizes Dr. Petum's report. And he mirrors the language that's almost identical. So where's the inconsistency here? When we get to step four and five of the sequential evaluation, we're not just looking at those areas that the judge references. And Dr. Petum gave a very lengthy form attached to his opinion. Let me see if I can come at the question in a different way. Look at the paragraph that I'm referring to on page 8 of the AOJ's report and tell me how that paragraph is inconsistent with Dr. Petum's report of his evaluation of Mr. Grew. You're talking about the bottom section, Your Honor? The full paragraph at the bottom. It's ER 35A. There's a bold 18 in the lower right-hand corner and it's page 8 of 11 of the AOJ's report. Right. Okay. So to answer that question, Your Honor, the administrative law judge did not  pick parts of it. He did not reference the difficulty in, let's see, it says there were some limitations in concentration and overall intellectual functioning. But the physician actually writes that there are moderate limitations in the ability to maintain attention and concentration for extended periods. He also finds that there are, let's see, moderate limitations in the ability to complete a normal work day and work week. Look at the last sentence of that paragraph. The AOJ writes there were some limitations in concentration and overall intellectual functioning following in the low average range citing to Exhibit 12F. Isn't that consistent with what you just read out of Dr. Petum's report? Well, the judge doesn't say the extent. If we adopt the extent in Dr. Petum's Does your argument boil down to the fact that even though the judge wrote a 12, I'm sorry, 11-page single-spaced decision summarizing and citing to the exhibits that he didn't say enough? Is that what this appeal turns on? That is not what this appeal turns on, Your Honor. This appeal turns on, and right now I'm going to limit it to Dr. Petum. There are many other issues here. But this appeal turns on whether the individual functional capacity for, quote, unskilled work set forth a proper assessment that encompasses all of the restrictions and limitations. We are at step five of a sequential evaluation process, and the burden is on the commissioner. And when we have a vocational expert sitting there testifying and says that certain limitations would preclude sustained work, and then the judge just says unskilled, quote, unquote, it misses half of the pie. But he's already, as a predicate, before he gets to that point, he's already set out all of the medical evidence, which at least to me indicates that he's considered everything before he comes to his conclusion. So then we're left with why did he not adopt all those moderate limitations set forth by Dr. Petum? He has to adopt everything if he doesn't he has to decide which of the medical evidence is most consistent with the medical records. You know, you're always going to have competing medical opinions, or often you'll have competing medical opinions, and the ALJ has to determine which of those is most credible. And give reasons why. And that's exactly the point. Here, Dr. Petum's not, his opinion is not in conflict with any of the other evidence. So the judge would have to do clear and convincing reasons to do that, and they're just not here. So let's hear from the social security admin. Thank you. Sorry. That's all right. Thank you. May it please the Court. I'm Dan Burrows. I'm a special assistant U.S. attorney for the District of Arizona here on behalf of the appellee, Carolyn Colvin, in this case. My opponent spent a lot of time talking primarily about Dr. Petum, and we had this discussion about, oh, we didn't include the moderate limitations. Actually, if you go on to the next page from the ones that the Court was discussing with my opponent, the ALJ does, he has an additional paragraph about Dr. Petum that's just as long as the one before where he actually does discuss moderate limitations. And I think the point of this is really that the appellant wants the ALJ to be able to mention every single piece of the record. And the record is 900 pages long. And these ALJs, agency expectations are that they write somewhere between 400 and 500 decisions a year. And there's lots of case law in this. The expectation that these be absolutely perfect decisions is unreasonable and not required by the law. The question is, can you tell by the thrust of the decision that the ALJ is going to be able to consider all the evidence, that he weighed the evidence? I think in this situation it's clear that he did. Again, it's not, is it written perfectly? Could he have put more information in? The answer to that is always yes. I think opposing counsel's problem is that in his view, the ALJ did not give clear and convincing reasons as to why he had a range of impairment as opposed to another. Where in the opinion of the decision of the ALJ do you think most closely the ALJ adhered to that requirement? Well, if I can back up for a second, that's a new argument from the appellant. He does discuss clear and convincing reasons in his brief, but that's only as relates to the ALJ's decision on credibility. He doesn't discuss clear and convincing reasons as it does on the doctor's opinions. Now, there is some case law that would require that in certain situations. Similar to the way that we brief credibility, we don't think that's accurate. And I think I addressed that in a footnote in our brief, that that's not the proper way to apply to this. But even if clear and convincing applies, clear and convincing only applies where the opinion is uncontradicted. And I think in this case it's clearly contradicted. I think the appellant conceded that by not arguing clear and convincing as related to the doctor's opinions in either of his briefs. So, I mean, that's not the standard the ALJ has to meet. The regulatory standard in 404.15.27, I believe it is, is that the ALJ give good reasons. And while the reasons that the ALJ gave here, in fact, in plenty of case law have been seen as clear and convincing, in this case it's not even the standard he has to meet. Now, the ALJ, as has been mentioned, discusses a lot of activities. And this is, again, to back up, what the court is reviewing is whether the ALJ's decision, viewed as a whole, is supported by substantial evidence in place. Attorneys like to, you know, pick and choose and nitpick in these decisions. And admittedly, they're pretty successful at it, which is why they keep doing it. But the question is whether the decision as a whole is supported. Whether the decision that this guy can do unskilled, sedentary work with a host of things he can't do, various postural restrictions, plus he has to have a sit-stand option, et cetera, et cetera, whether that's supported by the record. And here we have a person who, as you discussed earlier, works on cars, goes swimming. I mean, swimming is a pretty physically demanding activity. You know, it takes care of a lot of things. It's a lot of things. It takes care of his son, or at least tries to help take care of his son, depending on how you interpret the record. Moses lawn, those sort of things. This is not a guy who's completely and totally disabled. Yes, he used to be a police officer. But the question is not what did you used to do and what can you do now. One of the most ‑‑ Well, it is. I mean, that's step four and step five. Correct. The ultimate question is not simply have you had a significant diminution in your abilities. The ultimate question is can you still work in some job somewhere. I mean, one of the worst cases I ever handled from a personal perspective was a college professor who got encephalitis and her IQ dropped several points. And of course, she can no longer be a college professor. But that's not the question. Can you do your old job, ultimately. The question is can you be a greeter at Walmart. Can you sit and be a greeter. And in this case, they named two different jobs that the vocational experts said he could still do. Now, I would like to return to this issue of the moderate limitations that the appellant's attorney discussed. Those are not an RFC finding. The vocational expert's answers on those could not be substantial evidence to support the ultimate ruling, because this idea of moderate limitations in this and moderate limitations in that is not an RFC finding. The RFC finding, as the appellant himself argues, is a function-by-function assessment of what a person can do in all sorts of categories. What a person can do is not, well, you know, he's kind of moderately limited, mildly limited. That's an initial step that's used to assess the severity of the impairment. But it requires an additional step and a further interpretation of the evidence to determine what he can do exactly. I mean, that's addressed in the Stubbs-Danielson case, which we cite I think numerous times in our brief. But other cases this Court has cited as well, it's addressed in agency regulations, Social Security rulings. It's pretty clear that those moderate limitations are not an answer. And in fact, even if the vocational expert was also a doctor, the Social Security regulations prohibit him from making that translation. I mean, that's a medical opinion or that's factual opinion for the commissioner, not something for the vocational expert. So when you ask the vocational expert, well, what if you're moderately limited in the ability to, you know, be supervised, that requires some translation into what you can and cannot do. And that's outside of what vocational experts can. So his answers to that are not really evidence of anything. I would like to address the appellant raises lots of these as questions of law because that gets him a better standard of review. I think it's clear that most of them aren't. They're simply about substantial evidence. There is one thing he addresses as a question of law that I think can fairly be characterized as a question of law, and that's the function-by-function assessment. I would just direct you to the cases that we cite in our brief. If the ALJ cites a the regulatory definition of unskilled work, cites a regulatory definition of sedentary work, that's sufficient to meet the function-by-function requirement. And in fact, even if it's not in this case, it's harmless because this isn't a case that was cited in step four and this isn't a case that was cited on the grid. So it doesn't really matter one way or the other. So, counsel, I'm looking at page 55 of the opening brief, where it appears that the claimant is saying that a treating physician, SACDEVA. Yeah, Dr. SACDEVA, yeah. Applying that the claimant could sit 30 minutes at a time, up to two hours a day, can stand 200 feet at a time, up to two hours a day, and can lift more than 10 pounds but less than 15. And the vocational expert testified that with those limitations, Mr. the claimant could not sustain any work. And you had mentioned previously that there was no indication in the brief that the claimant was challenging the failure to discredit the treating physicians. But here is an example of where that was done. I'm sorry. If that's what I said, I misspoke. What I meant was he didn't raise the issue of clear and convincing reasons there, I don't believe. He does challenge Dr. SACDEVA, and I agree that Dr. SACDEVA is separate from Dr. Behrens and Dr. Petum, and that he did give a specific functional assessment, but the ALJ rejected that and gave good reasons for doing so. The argument was made that the ALJ rejected the opinion of the treating physician without giving supportive reasons. So would you tell me in the ALJ opinion where the opinion of Dr. SACDEVA is discredited and the reasons? Where are you finding that in the opinion of the ALJ? Dr. SACDEVA? I'm not sure how to pronounce it. The ALJ discusses Dr. SACDEVA, I believe it's page 34A of the excerpts of the record. It would be page 7 of the ALJ's decision. And he says that the limitations weren't supported by the records to that extent. Now, you asked me to point directly to where he does it. And I think that's not exactly the requirement that the case law sets out. What the case law sets out is that you look at the opinion or the ALJ's decision as a whole. And so we're talking about... Looking at the opinion, it has to be some clear, convincing reason why a treating physician's opinion is discredited. So even looking at the opinion as a whole, that's kind of a cop-out in a way. Because you're asking us to look at everything and garner something. But I'm asking you, what do we specifically look to to determine why that opinion was discredited? Right. And again, I would say there don't have to be clear and convincing reasons. There have to be good reasons. Because there's an uncontradicted opinion. And here there were numerous doctors' opinions that contradicted him. So whether they're good reasons, good reasons, right. So the ALJ, prior to this, discussed for, you know, four or five, six pages, I don't know, his finding on the RFC is one, two, three, four, like six or seven pages long. He discusses in there the fact that despite the fact that the appellant's claim that he's had horrible, horrible pain since the surgery, immediately after the surgery he had almost no complaints at all. He points out that the appellant admitted that as far as his mental situation, his medications were pretty good at dealing with his symptoms. He discusses, as we've mentioned before, about a paragraph of the appellant's activities that indicate that he can certainly do more than what Dr. Sashteva is talking about. The activities? Where is the indication that he can perform at a higher level than Dr. Sashteva indicated? Well, I think if you look at the top of, let me find a page number for you. If you look at the top of the very next page, page 18, he says he washed dishes, vacuumed, did laundry, mowed the lawn, shopped, took care of finances, small repairs on cars, he swims, he goes to the grocery store. So does the ALJ put a sentence in that says this contradicts what Dr. Sashteva says? No. But the court's job isn't to police the writing quality and clarity of the decision. Well, it's incumbent upon the ALJ to at least give us a signal as to why the ruling was made that was made. It doesn't have to be perfect, but there should be some indication as to why he accepted some evidence, why he credited some more than others. That's correct. And I think the ALJ gave that signal when he talked about Dr. Sashteva. He said this isn't supported by the record to this extent. And then he goes on to talk about what the record says immediately after there. So I think that's sufficient. I'm not saying this is a model of clarity. I don't think I ever get in a courtroom and say that about an ALJ's opinion. There's a really good Seventh Circuit case, and I'm sorry, I don't have the slide in front of me, that talks about, look, these ALJs work under incredible burdens and incredible pressures, and their supervisors, it's pretty colorful, you know, whip them to do more. I think it's a Judge Easterbrook opinion, so you can imagine it's a, you know, he has a lot of fun with it. Yeah, absolutely, absolutely. So the Commissioner's not up here arguing it's a model of clarity, but we are arguing that it is a model of clarity. I would like, if the court is interested to talk about the credit as true rule. I know you guys have been pushing that issue and you want to go and bank on it, and so far we have resisted that suggestion. There has been some evolution in this. I have to admit, the brief that I wrote over a year ago is not the brief I would write today. But we have thought about it, and we do suggest in a footnote that that has to be decided by an en banc panel, but I don't think that that's really correct anymore. Okay. Fair enough. Well, if there's any further questions, I can answer those. Otherwise, I will just sit down. I have nothing further. I think you may sit down. Thank you. Thank you. Mr. Slepin, I'll give you a minute on rebuttal. I was hoping you'd say that. I remember what it was like to be on that side of the room. I'm going to talk really fast to try to get my points across. But in terms of the credibility, there's no evidence of exaggeration or malingering here. All his activities, he says, he's doing with rest. He's been very compliant with his treatment program. He lost his job. Except the physical therapy. He didn't do too well. Didn't he miss six of his? No, he went to 28-28. That's what the record says. They were talking about sending him for more physical therapy. It looks like there was some room for it. But he went to 28-28 of his physical therapy appointments. What was the reference to missing six? That's what the judge found, is that he was missing physical therapy records. And that's not supported by the record? That's right. It actually says it's 28-28. Okay. Right. You know, he lost his job. He lost his house. He declared bankruptcy. He lost his wife. He has trouble with his relationship with his child. I was trying to do everything he can. Yeah, of course he's going to try to mow the lawn and try to hold things together. But if you look at Lingenfelter, they talk about guys are working three months, nine months. It's not contrary to disability. The other thing, when we were talking about Dr. Pitoum and the clear and convincing standard came up, my argument wasn't clear and convincing for Dr. Pitoum, because the ALJ accepted Dr. Pitoum. It supports disability, and we think it just should have been credited. There's no argument that anything should have been discounted from Dr. Pitoum's opinion. So we're saying accept it. The judge did apply the vocational expert testimony and come to the result that the vocational expert stated. You've run over. Thank you. Mr. Sepin, let me just say one thing. This is just a comment from me to maybe think about in briefing these cases. I found your brief to be very difficult to understand. In the first 25 pages where you just go through every medical appointment this guy's had, there were sentences that frankly I read them and I had no idea what they said, because they were so full of medical terminology. And we read these things, your briefs, on airplanes. We read them in places where I don't have access to a physician's desk reference. It would be very helpful in the future if you would think about the fact that you're writing a brief relating to lay judges that are not familiar with medical terminology. I will keep that in mind, and I appreciate it. Thank you. It's intended to help.
judges: Garbis, Tallman, Rawlinson